UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

**UNITED STATES OF AMERICA,**

    v.                                                        Case No.:    3:19cr38/MCR

**BILLY J. PELLETT, JR.**
                                         /

## **ORDER**

The Government indicted Defendant Billy J. Pellett, Jr. on one count of possessing a firearm and ammunition as a convicted felon, in violation of 18 U.S.C. § 922(g)(1). In response, Pellett asserted the affirmative defense of justification; that is, he admitted to possessing the firearm and ammunition as a convicted felon but maintained he was legally justified in doing so.[1] *See United States v. Deleveaux*, 205 F.3d 1292, 1296-97 (11th Cir. 2000). The parties submitted pretrial briefing on the justification defense and the Court took the matter under advisement for resolution at trial. Pellett waived a jury trial and the case proceeded to a bench trial on November 30, 2020. Having considered the evidence presented at trial, the parties' briefs and the applicable law, the Court enters the following findings of fact, conclusions of law and verdict.

---

[1] At trial, Pellett also stipulated that the interstate commerce jurisdictional requirement in 18 U.S.C. § 922(g) was met.

## I.    FINDINGS OF FACT

Late in the evening on November 6, 2018, Pellett was alone in his home at 6811 Vivian Drive in Pensacola, Florida, packing his motorcycle for a trip to Panama City the next morning. Pellett's motorcycle was parked in the backyard and accessible from inside the home only through a sliding glass door in the dining room on the back side of the house.[2] Pellett lived alone; however, his brother, Raymon West, co-owned the property and stored some belongings there.

Shortly before midnight, Pellett began carrying the last of his bags from his bedroom to his motorcycle. When he stepped into the dining room, he saw West standing in front of the sliding glass door. According to Pellett, the following encounter with his brother occurred and evolved "very quickly," lasting no more than three minutes.

Pellett was surprised to see West and reminded him that it was "not safe" for him to be at the house because the police had "been coming around looking for [him]" to serve an outstanding arrest warrant. West immediately became "extremely aggravated," accusing Pellett of calling the police on him, and then, while standing less than three feet away from Pellett, West grabbed a loaded revolver off a nearby cabinet, pointed it at Pellett's head, and cocked the hammer. The revolver was so

---

[2] According to Pellett, this was the only "viable" exit from the home that night. The other two exits—a kitchen door, and the front door—were always locked (with three locks apiece) and Pellett did not have keys to unlock them.

close to Pellett's face that he could see the individual bullets in its chambers. Pellett testified that there were no firearms in the house before West arrived.

Pellett reflexively dropped his bags, threw his hands in the air and tried to verbally diffuse the situation, to no avail. West remained agitated and combative, and kept the revolver with the cocked hammer aimed at Pellett's head. Based on West's paranoia, erratic movements and rapid speech pattern, Pellett believed he was "extremely high" on methamphetamine. Pellett testified that he feared for his life because West had a history of violence and he "had no idea what [his brother] was capable of" in that state.

A noise then sounded from the kitchen and West turned in that direction, at which point, Pellett quickly grabbed a piece of wood off a nearby table and swung it at the revolver in West's hand. The revolver fired and West dropped it to the floor. A brief physical struggle ensued, during which Pellett was able to seize possession of the firearm, pull away from West and stand up, point the gun at him, and persuade him to move away from the sliding glass door. During this exchange, Pellett saw that West had left a small baggie of methamphetamine on a cabinet near the door. As Pellett exited through the door, he picked up the methamphetamine and took it with him. He then walked to his motorcycle, tucked the methamphetamine in his vest pocket and the revolver in his waistband, climbed onto the motorcycle and fled from the premises.

Pellett testified that he was "extremely distraught" as he drove away and feared his brother may follow him. His sole focus was getting to a "secluded spot" where he could "get rid of" the revolver and West could not easily find him. He navigated directly to a dark and remote cul-de-sac at the dead-end of Triumph Street in Pensacola, approximately 0.7 miles from his home. Given the late hour, there was no traffic and the trip took no more than two minutes. Pellett had been to this location "numerous times" before and knew it was both heavily wooded, with an overgrowth of shrubs, bushes, and chin-high grass, and deserted, with no houses or businesses nearby.

When Pellett reached the end of Triumph Street, he turned off his motorcycle and parked it in the grass approximately five to eight feet off the road, and "a few feet" from the tree line, facing the direction from which he came. He stayed seated on the motorcycle but engaged the kickstand, causing the bike (and Pellett) to lean slightly sideways. The area was pitch black, with no street lights, so Pellett removed a small flashlight from his jacket pocket and put it in his mouth. He then retrieved the revolver from his waistband and, for the next couple of minutes or so, tried—unsuccessfully—to unload the remaining bullets. At this point, Pellett saw a pair of headlights turn towards Triumph Street and head slowly in his direction. Not knowing who it was, he "toss[ed]" the revolver down on the ground, thinking that

he "threw it up under the center" of his motorcycle.[3]  Then he climbed off the bike, lit a marijuana joint that he had in his vest pocket, and began feeling around in his saddlebags for his cell phone.  As the vehicle moved closer, Pellett realized it belonged to law enforcement, so he flicked his marijuana joint into the grassy overgrowth and continued rifling through his bags.

The law enforcement vehicle was driven by Deputy James Freeman, a K-9 handler with the Escambia County Sheriff's Office, who was on patrol duty and parked in a nearby field shortly after midnight on November 7, 2018, when he saw a flash of light coming from the dead-end side of Triumph Street.  Deputy Freeman knew the area should be deserted at that late hour—the property was owned by Gulf Power, overgrown with tall grass and trees, and posted with a no trespassing sign—so he drove over to investigate the source of the light.  As Deputy Freeman reached the end of Triumph Street, he saw Pellett standing beside a motorcycle rummaging through the saddlebags and his jacket pockets.  Deputy Freeman called for backup, then exited his car, approached Pellett and asked him what he was doing there.  Pellett responded that he came to get away and cool off after an argument with his

---

[3] At trial, Pellett testified that he attempted to throw the revolver into the woods but an old finger injury caused the revolver to drop from his hand to the ground near his motorcycle.  The Court discredits this testimony, in light of Pellett's statements to Deputy Turner at the scene, which were recorded by the deputy's dashboard camera, that he intentionally "threw [the revolver] up under the center" of the bike and he knew it was there at his feet.

Case No. 3:19cr38/MCR

brother.  Pellett then attempted to reach into his vest pocket for a cigarette but Deputy Freeman stopped him from doing so.

Around this time, a second deputy—Deputy Mark Turner—arrived on scene and took over the call.  Deputy Turner patted down Pellett for officer safety, while Deputy Freeman investigated the area around the motorcycle.  While shining his flashlight at the ground, Deputy Freeman observed a silver revolver lying underneath the bike's rear tire and advised Deputy Turner and Pellett of what he had discovered.  Pellett immediately and spontaneously stated that the gun was not his and that he had only thrown away a marijuana joint.  At this point, Pellett said nothing about the incident with his brother.  Deputy Turner placed Pellett in handcuffs, then searched Pellett's person and the saddlebags on his motorcycle.  In Pellett's vest pocket, Deputy Turner found marijuana and methamphetamine.  On the motorcycle, he found more marijuana and drug paraphernalia, as well as clothing.

The deputies attempted to "clear" the bullets from the revolver; however, it appeared to be jammed and they were unable to render it safe.  They asked Pellett if he knew "some secret" to clearing the revolver, but Pellett said he did not because the gun did not belong to him.  Again, he said nothing about his brother.  Deputy Freeman returned the revolver to the ground with its barrel facing in a safe direction until an evidence technician arrived and ultimately cleared the jam.  In the meantime, Deputy Turner placed Pellett in the back seat of his police vehicle.  Shortly

Page 7 of 14

thereafter, Deputy Turner read *Miranda* warnings to Pellett, who agreed to make a statement and answer questions. Pellett briefly described the fight with his brother, including how he disarmed his brother and fled the home with the revolver. He said he planned to leave the revolver in the woods but acknowledged knowingly tossing the revolver right at his feet instead and stated that he did not alert the deputies to its presence because he "didn't want any problems." When Deputy Turner asked why he did not actually throw the revolver into the woods if that was his plan, Pellett did not have a response. Regarding the methamphetamine found in his vest pocket, Pellett said that he took it to make his brother angry—"You pull a gun on me, I take your stuff." Pellett was transported to the Escambia County Jail. During a recorded phone call from the jail the next day, Pellett told his girlfriend that law enforcement did not find the revolver on him, that "[i]t was on the damn ground" because he "threw it down when they got there." *See* Gov. Exh. 7A. This case followed. As already discussed, at trial, Pellett conceded the facts that establish his possession of a firearm as a convicted felon. The only remaining issue is whether he was justified in doing so.

## II.   CONCLUSIONS OF LAW

The defense of justification is an affirmative defense to a charge of possessing a firearm as a felon under § 922(g)(1) that a defendant bears the burden of proving

by a preponderance of the evidence.[4] *See Deleveaux*, 205 F.3d at 1296-97. The defense is construed "very narrowly" and reserved for "extraordinary circumstances." *Id.*; *see also United States v. Vereen*, 920 F.3d 1300, 1310 (11th Cir. 2019).

> To establish the justification defense, a defendant must prove:
>
> (1) that [he] was under unlawful and present, imminent, and impending threat of death or serious bodily injury; (2) that [he] did not negligently or recklessly place himself in a situation where he would be forced to engage in criminal conduct; (3) that [he] had no reasonable legal alternative to violating the law; and (4) that there was a direct causal relationship between the criminal action and the avoidance of the threatened harm.

*Deleveaux*, 205 F.3d at 1297. A temporal principle limits the defense—the defendant's legal justification for possessing a firearm lasts only as long as the circumstances giving rise to it continue to exist. *See United States v. Bailey*, 444 U.S. 394, 415 (1980); *see also United States v. Scales*, 599 F.2d 78, 80 (5th Cir. 1979) (quoting *United States v. Hammons*, 566 F.2d 1301, 1304 (5th Cir. 1978), *vacated and remanded on other grounds*, 439 U.S. 810 (1978)).[5] In other words,

---

[4] The defense does not negate any element of § 922(g)(1); rather, it "serves only as a legal excuse for the criminal act and is based on additional facts and circumstances that are distinct from the conduct constituting the underlying offense." *United States v. Deleveaux*, 205 F.3d 1292, 1297-98 (11th Cir. 2000).

[5] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit, , adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

continued possession of the firearm beyond the time that the exigency exists will "defeat" the defense. *See United States v. Gant*, 691 F.2d 1159, 1163 n.9 (5th Cir. 1982).

In this case, Pellett has shown by a preponderance of the uncontroverted evidence presented at trial that he faced an unlawful, imminent and unprovoked threat of death or serious bodily injury at the hands of his brother, and had no reasonable legal alternative to violating the law, when he first took physical possession of the firearm and ammunition, and fled from the home with them on his motorcycle. Pellett's brother, who was very combative and "extremely high" on methamphetamine, had aimed the loaded firearm at Pellett's head, cocked it, repeatedly threatened to kill him, and even fired the weapon, while blocking Pellett's only "viable" exit from the premises.[6] Under those circumstances, there was a direct causal connection between Pellett disarming his brother by taking brief possession of the firearm and avoiding the threatened harm of a gunshot to his head. On this undisputed record, the Court concludes that Pellett's initial possession of the firearm and ammunition was legally justified.

The problem for Pellett—and for the availability of the justification defense in this case—is that he "did not rid himself of possession of the firearm as promptly as reasonably possible," *see Vereen*, 920 F.3d at 1311, and, instead, continued to

---

[6] Ballistics evidence later confirmed that the revolver had been fired.

possess it after the threat from his brother abated. Possession of a firearm may be either actual or constructive, and may be shown by both circumstantial and direct evidence. *United States v. Crawford*, 906 F.2d 1531, 1535 (11th Cir. 1990). Actual possession exists where a person knowingly has "direct physical control over" a firearm. *Henderson v. United States*, 135 S. Ct. 1780, 1784 (2015). Constructive possession is established where a person "(1) was aware or knew of the firearm's presence and (2) had the ability and intent to later exercise dominion and control over" it. *United States v. Perez*, 661 F.3d 568, 576 (11th Cir. 2011). Possession of a firearm by a convicted felon is a continuing offense; that is, the offense continues as long as the possession continues. *See United States v. Rice*, 259 F. App'x 300, 302 (11th Cir. 2007) (citing *United States v. D'Angelo*, 819 F.2d 1062, 1066 (11th Cir. 1987)). Consequently, in order for a felon's possession of a firearm to be legally justified in this context, his "apprehension of immediate danger must continue during the whole time" that he possessed the firearm. *United States v. Sixty Acres in Etowah Cnty.*, 930 F.2d 857, 861 (11th Cir. 1991); *see also Bailey,* 444 U.S. at 412 ("[I]n order to be entitled to an instruction on duress or necessity as a defense to the crime [of escape from federal custody], an escapee must first offer evidence justifying his continued absence from custody as well as his initial departure[.]").

Here, Pellett physically possessed the loaded revolver for approximately five to seven minutes—from the moment he disarmed his brother at his home until the

moment he tossed the gun to the ground on Triumph Street. Although no longer in actual possession of the gun, at that point, Pellett's possession became constructive, as his recorded statements to Deputy Turner demonstrate he was aware of and knew that he had placed the revolver at his feet by the motorcycle, and he had the ability and intent to later retrieve it, whether to dispose of it or otherwise. If he truly intended to permanently discard the revolver in that moment, never to retrieve it, he could have easily done so by throwing it into the wooded overgrowth. He did not. Instead, Pellett constructively possessed the loaded revolver for several minutes, until law enforcement discovered and seized it. By that time, the imminent threat of death or serious bodily injury from his brother had been over for nearly 10 minutes. Indeed, West was nowhere to be seen and Pellett acknowledged feeling he was "in a safe environment" once he arrived at the Triumph Street location.[7] Yet he did not promptly dispose of the revolver. And, significantly, when law enforcement arrived, Pellett did not immediately turn over the revolver to them or tell them about it. Instead, he concealed it and initially denied having even placed it on the ground. This evidence establishes that Pellett had reasonable legal alternatives to continuing

---

[7] The fact that Pellett stole the methamphetamine as he left the altercation with his brother (and, by his own admission, did so to make his brother angry), and that he "disarmed" himself on Triumph Street, also tend to show he recognized there was no further danger. However, even if he still feared his brother *might* end up finding him at that location, a fear of possible future danger does not satisfy the immediacy criterion of the justification defense, absent an imminent threat and a lack of lawful options. *See United States v. Poole*, --- F. App'x ---, 2020 WL 6887819, at *3 (11th Cir. 2020) (citing *United States v. Rice*, 214 F.3d 1295, 1297-98 (11th Cir. 2000)).

to possess the revolver—that is, opportunities to get rid of it and/or to surrender it to police.[8]  His failure to choose one of these alternatives once he was safe undermines his assertion that he possessed the revolver no "longer than absolutely necessary" and precludes a finding of legally justified possession.  *See Deleveaux*, 205 F.3d at 1298 n.10 (agreeing with circuits that rejected the justification defense where "the defendant failed to show that he did not maintain possession of the firearm any longer than absolutely necessary"); *id*. (finding it "not at all clear" that a justification instruction is warranted where a defendant "did not turn over the gun [at issue] or tell the police about [it], but continued to possess it, hiding it in the attic"); *United States v. Al-Rekabi*, 454 F.3d 1113, 1123 (10th Cir. 2006) ("Some attempt to place a stolen pistol into the hands of the police is an irreducible minimum in evaluating [a defendant's] necessity defense, especially since [the defendant's] possession (actual or constructive) and hence his crime was continuing.  By keeping or stashing the pistol, . . . [the defendant] continued to perpetuate the underlying crime.")).

The fact that Pellett possessed the revolver—either actually or constructively—for no more than 7 to 10 minutes after the imminent danger from

---

[8] The Government argues that two additional options were available to Pellett when he fled his home after the altercation with his brother.  First, he could have stopped at a 24-hour Shell gas station, which he drove past on his way to Triumph Street, and called police.  Second, he could have driven to the Sheriff's Office, several miles away, to report what happened and turn over the revolver.  The Court does not consider either of these options to be reasonable as both would have extended Pellett's possession beyond the approximate 10 minutes that occurred in this case.

Case No. 3:19cr38/MCR

his brother subsided does not compel a contrary conclusion. Section 922(g)(1) makes it unlawful for a convicted felon to possess a firearm. The statute is written in "absolute" terms. *Deleveaux*, 205 F.3d at 1299. That possession is momentary is immaterial. *Vereen*, 920 F.3d at 1308 ("The statute explicitly punishes possession, not retention, and thus in no way invites investigation into . . . how long that possession lasted.") (internal marks omitted); *id*. at 1309 (noting that "even momentary or fleeting possession of a firearm is sufficient under" § 922(g)(1)). Applying § 922(g)(1) in the context of the justification defense, courts have repeatedly concluded that even where a convicted felon's possession of a firearm was justified at the outset by an imminent threat of death or seriously bodily injury, *any* "continued possession [of the firearm] beyond the time that the emergency exists" is unjustified and unlawful. *See Gant*, 691 F.2d at 1163 n.9; *see also Hammons*, 566 F.2d at 1303-04 (justification defense unavailable where defendant retained possession of firearm for 10 minutes after the emergency conditions "vanished" and "surreptitious[ly]" tried to rid himself of the gun after police arrived); *United States v. Parker*, 566 F.2d 1304, 1305-06 (5th Cir. 1978) (justification defense unavailable where defendant retained possession of gun for 30 minutes after being attacked in his home); *United States v. Stover*, 822 F.2d 48, 50 (8th Cir. 1987) (justification defense inapplicable where defendant seized a firearm from his assailant and retained it for approximately 10 minutes after the assailant

fled the scene). So too here. And it is worth noting that the only reason Pellett's possession of the loaded revolver did not extend for a longer period of time was because law enforcement discovered and seized it moments after he tossed it at his feet. *See Vereen*, 920 F.3d at 1312; *United States v. Palma*, 511 F3d 1311, 1316 (11th Cir. 2008).

The Court appreciates the difficulty faced by someone in the situation that Pellett described. Pellett's status as a convicted felon, his previous experiences with law enforcement, and his allegiance to his brother may explain his choices that night. But they do not justify them. On this record, Pellett has failed to show by a preponderance of the evidence that his continued possession of the loaded revolver after the danger abated was justified. Therefore, the justification defense does not apply.

### III. VERDICT

For the reasons set forth above, the Court finds Defendant Billy J. Pellett, Jr. **GUILTY** as charged in Count One of the superseding indictment. A presentence investigation report will be ordered, and a sentencing hearing will be set by separate order.

**SO ORDERED**, on this 19th day of December, 2020.

*M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**